UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

RIVER FIELDS, INC., et al.,                                                          PLAINTIFFS

v.                                                                 CIVIL ACTION NO. 3:08-CV-264-S

MARY PETERS, SECRETARY,
U.S. DEPARTMENT OF TRANSPORTATION, et al.,                          DEFENDANTS

## <u>MEMORANDUM OPINION</u>

This matter is before the court upon the cross-motions of plaintiffs River Fields, Inc., River

Creek Homeowners Association, Wolf Pen Preservation Association, Harrods Creek Boat Owners

Association, and OPEN Louisville, Inc. (hereinafter collectively, "Plaintiffs"), and defendants the

Secretary of the U.S. Department of Transportation, the Acting Administrator of the Federal

Highway Administration, the Kentucky Division Administrator, the Secretary of the Kentucky

Transportation Cabinet, and Louisville/Jefferson County Metro Government (hereinafter

collectively, "Defendants") for summary judgment (DN 32; DN 36).  These motions have been fully

briefed (DN 37; DN 42; DN 55).  For the reasons that follow, Plaintiffs' motion will be denied and

Defendants' motion will be granted.[1]

BACKGROUND

At issue is whether Defendants complied with Section 4(f) of the Department of

Transportation Act ("Section 4(f)"), 23 U.S.C. § 138, 49 U.S.C. § 303, and the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), prior to approving a project to widen

to two-lanes the historic Harrods Creek Bridge, a one-lane bridge carrying the River Road Scenic

---

[1]Defendants have also moved to strike declarations attached to Plaintiffs' motion for
summary judgment (DN 38).  This motion has been fully briefed (DN 39; DN 41) and will be
denied.  The court will consider Plaintiffs' declarations, however, for the sole purpose of
determining standing.

Byway over Harrods Creek in the Upper River Road area of Louisville, Kentucky ("Harrods Creek Bridge Project," or the "Project").  Plaintiffs challenge two decisions made by the Secretary of the U.S. Department of Transportation and the Acting Administrator of the Federal Highway Administration (hereinafter collectively, the "FHWA") in connection with the Project.  First, Plaintiffs challenge the FHWA's execution of the "Level 3"[2] Categorical Exclusion Checklist ("CE Checklist," or the "Checklist") on February 13, 2006, in lieu of preparing either an Environmental Assessment ("EA") or an Environmental Impact Study ("EIS") as unlawful and invalid under NEPA. Second, Plaintiffs challenge the FHWA's execution of the programmatic Section 4(f) approvals on February 9, 2006, in lieu of preparing an individual Section 4(f) evaluation as unlawful and invalid under Section 4(f).

The Harrods Creek Bridge Project began in 2000 when the Kentucky Transportation Cabinet (the "KYTC") and Louisville/Jefferson County Metro Government ("Louisville Metro")[3] agreed to improve the Harrods Creek Bridge (the "Bridge") as a federal transportation project.  The Bridge, a single-lane concrete arch bridge built in 1912, has undergone no significant repairs since 1914 and has been closed to traffic since November 2008.[4]  The stated purpose of the Project is to improve safety by widening the Bridge to two-lanes while preserving the historic character of the Bridge as

---

[2] Pursuant to a Categorical Exclusion Agreement entered into between the FHWA and the Kentucky Transportation Cabinet in August 1993 ("CE Agreement"), a "Level 3" Categorical Exclusion is required for "[a]ctions with impacts not discussed in this Agreement or with higher impacts than listed in Table 2," such as "[u]nresolved or substantial public and/or resource agency opposition."  CE Agreement, p. 8 (Aug. 21, 2003).  The CE Agreement can be found at http://www.transportation.ky.gov/EnvAnalysis/SFX110.pdf.

[3] The local government was then known as Jefferson County.

[4] The Bridge was closed by Louisville Metro following a one-car traffic accident that damaged one of the Bridge's guard rails.

much as possible.  In addition, the Project calls for slightly widening the curve on River Road approaching the Bridge from the south and removing vegetation to improve sight distances.

The Bridge is both individually eligible for listing in the National Register of Historic Places ("National Register"), and is also a contributing element to the National Register-eligible River Road Historic District.  The Bridge lies nestled amidst a collection of other National Register-listed historic districts, and is adjacent to several individually listed National Register historic properties.  The Project calls for partial takings of two of these properties.[5]  Because the Project uses federal funds, compliance both with NEPA and Section 4(f) is required.[6]

NEPA provides, in pertinent part:

[A]ll agencies of the Federal Government shall. . . (C) include in every recommendation or report on proposals for. . . major Federal actions significantly affecting the quality of the human environment, a detailed statement. . . on— (1) the environmental impact of the proposed action. . .

42 U.S.C. § 4332(2)(C).  The regulations to implement NEPA promulgated by the Council on Environmental Quality ("CEQ") provide for a number of different steps that an agency may take to determine whether a proposed action will "significantly" affect the environment and thus require an EIS.  40 C.F.R. §§ 1501.4, 1502.14, 1508.11.  Specifically, an agency may adopt procedures which include:

---

[5]The Project takes 0.014 acres from Belleview and 0.042 acres from the Merriwether House for the Project's right of way.  Administrative Record ("AR") 170, Bates # 2280.  The Merriwether House was originally part of a Reconstruction-era African-American community.  The Belleview Historic Farm District is a circa 1855 historic farmstead with 123 acres.

[6]The use of federal funds also requires compliance with Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, which requires federal agencies to take into account the effects of their undertakings on historic properties and afford the Advisory Council on Historic Preservation ("ACHP") a reasonable opportunity to comment.  Plaintiffs have not challenged the adequacy of Defendants' compliance with NHPA.

(2) Specific criteria for and identification of those typical classes of action:
(i) Which normally do require environmental impact statements.
(ii) Which normally do not require either an environmental impact statement or an
environmental assessment (categorical exclusions (§ 1508.4)).
(iii) Which normally require environmental assessments but not necessarily
environmental impact statements.

40 C.F.R. § 1507.3.  A Categorical Exclusion ("CE") is an action which has been found by the

agency not to individually or cumulatively have a significant effect on the environment and therefore

requires neither an EA nor an EIS.  40 C.F.R. § 1508.4.

Under FHWA regulations, bridge widening projects may be classified as CEs, provided they:

. . .do not induce significant impacts to planned growth or land use for the area; do
not require the relocation of significant numbers of people; do not have a significant
impact on any natural, cultural, recreational, historic or other resource; do not
involve significant air, noise, or water quality impacts; do not have significant
impacts on travel patterns; or do not otherwise, either individually or cumulatively,
have any significant environmental impacts.

23 C.F.R. § 771.117(a).  Bridge widening projects "may be designated as CEs only after [FHWA]

approval.  The applicant shall submit documentation which demonstrates that the specific conditions

or criteria for these CEs are satisfied and that significant environmental effects will not result."  23

C.F.R. § 771.117(d).   A bridge widening project which results in significant impacts on the

environment or historic sites renders the CE inapplicable (and thus requires either an EA or an EIS).

23 C.F.R. § 771.117(b).  An EA is normally prepared to determine whether an EIS is necessary or

a finding of no significant impact.  40 C.F.R. §§ 1501.3, 1508.9.

The FHWA approved the designation of the Harrods Creek Bridge Project as a CE based on

the CE Checklist submitted by the KYTC.[7]  Plaintiffs allege that the Checklist fails to adequately

---

[7]The CE Checklist includes some 200 pages of supporting documentation.  AR 170,
Bates # 2233-2443.

-4-

document determinations that the Project will not result in significant effects on the environment and/or historic sites. Plaintiffs assert that the FHWA is therefore required to prepare either an EA or an EIS for the Project. Defendants assert that they have fully complied with the requirements of NEPA.

Section 4(f) provides, in pertinent part:

> [T]he Secretary may approve a transportation program or project. . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if— (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303; 23 U.S.C. § 138. Under FHWA regulations, determinations approving the use of Section 4(f) property "shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property." 23 C.F.R. § 774.7(a).[8]

The FHWA has adopted several "[p]rogrammatic Section 4(f) evaluations. . . a time-saving procedural alternative to preparing individual Section 4(f) evaluations under [23 C.F.R. § 774.7(a)] for certain minor uses of Section 4(f) property." 23 C.F.R. § 774.7(d). The programmatic Section 4(f) evaluations implicated here are the "Historic Bridges" and "Minor Involvement with Historic

---

[8]Citations are to the FHWA's recently-promulgated Section 4(f) regulations, which were issued in final form in April 2008. While the Section 4(f) determination in this matter was made prior to April 2008, the new Section 4(f) regulations are substantially identical to the Section 4(f) regulations as they existed prior to April 2008.

Sites" Programmatic Section 4(f) Evaluations.[9] "The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation." 23 C.F.R. § 774.3(d)(1). Both the Historic Bridges and Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluations make clear that "[t]he programmatic Section 4(f) evaluation does not apply if a reasonable alternative is identified that is not discussed in this document." Historic Bridges Programmatic Section 4(f) Evaluation at 38,139. "If the project facts do not fall within the applicability criteria of the programmatic evaluation or if any of the conditions of the programmatic evaluation are not met, then an individual Section 4(f) evaluation is required." Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluation at 31,111.

The FHWA utilized the Historic Bridges and Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluations to determine approval for the use of historic sites for the Harrods Creek Bridge Project. Plaintiffs allege that the FHWA failed to consider their reasonable "Enhanced One-Lane Bridge Alternative," and that the impact of the Project on historic sites is not minor. Therefore, Plaintiffs assert that the FHWA is required to prepare an individual Section 4(f) evaluation for the Project. Defendants assert that they have fully complied with the requirements of Section 4(f).

Plaintiffs seek a declaratory judgment that Defendants have failed to comply with the environmental studies and documentation requirements of NEPA and Section 4(f) and injunctive

---

[9]Historic Bridges; Programmatic Section 4(f) Evaluation and Approval, 48 Fed. Reg. 38,135 (Aug. 22, 1983); Nationwide Section 4(f) Evaluations and Approvals for Federally-Aided Highway Projects With Minor Involvement With Public Parks, Recreation Lands, Wildlife and Waterfowl Refuges, and Historic Sites, 52 Fed. Reg. 31,111 (Aug. 19, 1987).

relief prohibiting the FHWA and/or the KYTC from financing, approving, contracting for, commencing, allowing, or continuing construction on the Project unless and until such time as the FHWA has complied with NEPA and Section 4(f). Defendants assert that they have fully complied with the requirements of NEPA and Section 4(f) and therefore Plaintiffs are entitled to no such relief.

This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, 28 U.S.C. § 1361, and 5 U.S.C. § 702. Venue is proper under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

DISCUSSION

**Standards of Review**

The two decisions made by the FHWA challenged by Plaintiffs here are subject to judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. § 704, et seq. The standard of review is whether the agency decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241 (1973).

In reviewing the FHWA's NEPA decision, the role of the court is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions. *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98, 103 S. Ct. 2246 (1983).

In reviewing the FHWA's Section 4(f) decision, the court's role is to decide: (1) Whether the FHWA acted within the scope of its authority; (2) Whether the FHWA's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; and (3) Whether the FHWA's action followed the necessary procedural requirements. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-17, 91 S. Ct. 814 (1971).

-7-

The court "is not to determine the *correctness*, in some ultimate sense, of an agency's actions.  A reviewing court is limited to determining only the *legality* of the challenged action." *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674, 678 (5th Cir. 1973) (emphasis in original).  The court may not substitute its judgment for that of the agency.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 98 S. Ct. 1197 (1978); *Overton Park*, 401 U.S. 402 (1971).

Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's final administrative decision even though the court does not employ the standard of review set forth in Fed. R. Civ. P. 56.  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995).  The court's review is limited to the administrative record.  *Id*.  The evidence (as drawn from the administrative record) must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).  The party challenging the agency action bears the burden of proof in these cases.  *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

## NEPA

Plaintiffs allege that the FHWA violated NEPA by approving the Project as a CE based on the CE Checklist.  Plaintiffs contend that the Checklist has failed to establish that the Project will not significantly impact traffic patterns and/or historic sites.  The Checklist includes traffic studies consisting of: (1) a traffic count from 2004 for the northern approach to the Bridge; (2) a traffic count from 2005 for the southern approach to the Bridge; (3) a projection of average annual daily traffic on River Road in the year 2021 based on an assumed historical increase of 2.33% per year; and (4) a study of traffic volumes, speeds, headways, and types of vehicles using the roadway from 2001.  AR 170, Bates ## 2246-71.  The Checklist also includes the opinion of Defendants'

consultant that the Project will not result in significant impacts on travel patterns.  The basis for that "engineering judgment" was the fact that no new traffic generators or additional through lanes were planned as part of the Project.  AR 41, Bates # 134; AR 64, Bates # 332; AR 170, Bates ## 2326-32.

Additionally, as a term of the Memorandum of Agreement ("MOA") between Defendants and the State Historic Preservation Officer (the "SHPO"),[10] Defendants agreed to conduct speed, volume count, and classification of vehicles studies after construction in order to determine if the Project will result in significant changes in traffic patterns.  Defendants agreed to add traffic-calming measures as appropriate within the historic district if the Project results in significant changes in traffic patterns.  AR 170, Bates # 2274.  The MOA is included with the Checklist.  AR 170, Bates # 2272-76.

Plaintiffs argue that the traffic studies included with the CE Checklist are inconclusive as to the severity of the impact that the Project will have on traffic patterns.  Moreover, Plaintiffs argue that this defect cannot be and is not cured by Defendants' promise to conduct post-construction traffic studies.  As Plaintiffs put it, an applicant may not satisfy the reporting requirements of NEPA by "locking the barn door after the horses are stolen."  *Lathan v. Volpe*, 350 F.Supp. 262, 266 (W.D. Wa. 1972).  Plaintiffs argue that the failure to undertake a study to determine the extent to which a wider Bridge might induce additional traffic before approving the CE is reversible error.  Plaintiffs further decry the notion of "engineering judgment" and argue that the opinion of Defendants' consultant is baseless.

Defendants' consultant admits that conducting an "Origin and Destination" survey of all

---

[10]Execution of an MOA between the lead agency involved and the SHPO containing binding, agreed-upon measures to mitigate adverse effects on historic properties is the goal of the Section 106 review process.  36 C.F.R. § 800.6.

households east of Prospect[11] which commute to all points west of the Bridge would be a "viable" way to ascertain expected increases in traffic volume due to the widening of the Bridge. However, the cost to conduct such a survey would be "staggering." AR 64, Bates # 332. Regardless, the feasibility of conducting an "O&D" prior to construction is not dispositive of the issue of the FHWA's traffic effects determination. Plaintiffs have failed to cite any authority which states that FHWA regulations implementing NEPA require traffic modeling projections in order to demonstrate that an action will not significantly impact travel patterns. The court's task is "to determine whether the decision was arbitrary or capricious, not whether another scientific study could have been conducted." *Lathan* at 266.

This is not a case where Defendants "barely took *any* look" at the traffic consequences of the Project in the CE Checklist. *Protect Key West, Inc. v. Cheney*, 795 F.Supp. 1552, 1559 (S.D. Fl. 1992) (emphasis in original). Rather, the court is satisfied that Defendants took the required "hard look" at the impact of the Project on travel patterns. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005). First, Defendants investigated the impacts of the Project. Defendants' traffic studies and consultant reports have already been noted. Second, Defendants acknowledged the risks that those impacts entail. From the outset of the Section 106 process, the issue of traffic impacts dominated discussion among the consulting parties[12] – a group that included Plaintiffs – and Defendants responded to all comments and concerns voiced. Those comments,

---

[11]The Third Class city of Prospect, Kentucky lies due east of the Bridge.

[12]"Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." 36 C.F.R. § 800.2(c)(5).

concerns, and responses are included with the Checklist.  Third, Defendants explored measures to alleviate those risks.  Defendants consulted with the SHPO and the ACHP on the issue of potential adverse traffic impacts and planned mitigation.  Those correspondences are also included with the Checklist.  Under the totality of the circumstances, there is sufficient evidence in the Checklist to support the FHWA's finding of no significant impact on travel patterns.

Likewise, there is sufficient evidence in the Checklist to support the FHWA's finding of no significant impact on historic sites.  Plaintiffs argue that the FHWA refused to acknowledge any adverse effects of the Project on adjacent National Register historic properties and refused to evaluate the cumulative adverse impacts of the Project on surrounding historic districts despite evidence of such in the Checklist.  Plaintiffs point out that the Checklist includes the opinion of Defendants' own consultant that "Direct visual impacts to the Merriweather [sic] House, Belleview, and the proposed Harrod's [sic] Creek Historic District [13] have the potential to be adverse. . ."  AR 45, Bates # 143; AR 170, Bates ## 2283-93.  Further, the Cultural Resource Report prepared by Defendants' consultant states that "[T]he removal of some of the tree canopy along Harrod's [sic] Creek. . . has the potential to alter the viewshed of Belleview."  AR 50, Bates #167.  "The [Project] could alter the historic setting which contributes to the significance of [the Merriwether House]."  AR 50, Bates #175.  "The [Project] has the potential to alter characteristics which contribute to the significance of [the River Road Historic District]."  AR 50, Bates # 187.

Plaintiffs also note that the Checklist includes the forewarning of the ACHP that "[T]he effects to the River Road District may be adverse if traffic patterns change as a result of the project."

---

[13]The River Road Historic District is also referred to as the Harrods Creek Village Historic District.

AR 170, Bates # 2292.  However, the FHWA's finding of no significant impact on traffic tends to

negate the ACHP's concern.  Moreover, while Defendants' consultant advises of potentially adverse

direct visual impacts to historic sites, he goes on to explain how such impacts could be alleviated:

> Direct visual impacts to the Merriweather [sic] House, Belleview, and the proposed Harrod's [sic] Creek Historic District have the potential to be adverse **and could be addressed in a Memorandum of Agreement. . .  The direct impact of rehabilitation of the bridge itself, which is considered eligible for the National Register, will also have to be resolved in the Memorandum of Agreement.**

AR 45, Bates # 143 (emphasis added).

In fact, direct visual impacts to historic sites and the direct impact of rehabilitation of the

Bridge itself are resolved in the MOA.  The MOA provides, in pertinent part, that the reconstructed

Bridge will mimic the original in its appearance and materials, and vegetation that is removed will

be replaced in accordance with a landscape plan.  AR 170, Bates ## 2272-76.  The MOA is a

contract and Defendants are bound by its terms.  *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir.

2000) (citing *Citizens' Comm. for Envt'l Protection v. U. S. Coast Guard*, 456 F.Supp. 101, 115

(D.N.J. 1978).  In the words of the ACHP, which oversees the Section 106 process, "While these

measures are considered inadequate by [Plaintiffs], they do reveal that the effects to the [River Road

Historic] District and the Merriwether House have been considered by FHWA, and accepted by the

[KYTC], SHPO, and Louisville Metro Government."  AR 170, Bates # 2293.

In addition, the FHWA considered the cumulative impact of the Project as required by its

own and CEQ regulations implementing NEPA.  23 C.F.R § 771.117(a); 40 C.F.R. §§ 1508.7,

1508.8, 1508.27.  Plaintiffs argue that the FHWA refused to evaluate the cumulative impact of the

Project on traffic, with attendant adverse effects to historic sites, in the larger River Road corridor.

Plaintiffs further suggest that Defendants failed to consider the incremental impact of the Project

when added to other such reasonably foreseeable actions as future development east of the Bridge, the proposed I-265 ("East End") Bridge crossing the Ohio River, and the planned expansion of I-71 to six lanes.

With regard to Plaintiffs' former contention, which speaks to the scope of the environmental document as a whole rather than the scope of the cumulative impact analysis, the SHPO specifically agreed *not* to include the larger River Road corridor within the Area of Potential Effects ("APE").[14] The SHPO further stipulated that any cumulative impacts within the larger River Road corridor would be addressed in the MOA. AR 76, Bates # 399. As to Plaintiffs' latter contention, while "[m]ultiple actions with independent utility and independent use may affect the cumulative environmental impact to an area and may need to be considered in each action's cumulative impact analysis even if the actions are analyzed in separate environmental impact statements," *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. of Transp.*, 151 F.Supp.2d 661, 698 n.34 (M.D.N.C. 2001), any impacts to the APE from the abovementioned possible megaprojects are rightfully reserved for study as part of those projects. To conflate the estimated impacts of the *proposed* East End Bridge, for example, with the impacts of the Project would only serve to obfuscate rather than enlighten the Project's overall environmental effects. Such a result would frustrate the purpose of the cumulative impact requirement. *See Id.* at 697-98. The FHWA has adequately considered and disclosed the environmental impacts of the Project on historic sites. *Baltimore Gas and Elec. Co.*, 462 U.S. 87 (1983).

_____

[14]"Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *36 C.F.R. § 800.16(d)*.

As a follow-up argument, Plaintiffs also argue that the Checklist fails to document a number of other environmental conditions and criteria.  These include the Project's impacts on: threatened and endangered species; noise sensitive receivers/land uses adjacent to the Project; brownfield sites; surface water quality; and school districts, businesses, and fire protection.[15]  *See* 23 C.F.R. § 771.117(a).  However, the record shows that Defendants consulted with sister agencies such as the U.S. Fish and Wildlife Service, where appropriate, and received documented concurrence with their determinations on these issues.  AR 170, Bates ## 2283-2325.  Defendants sufficiently documented all environmental impacts of the Project in accordance with the requirements of both CEQ and FHWA regulations implementing NEPA.  Accordingly, the FHWA's decision to approve the Project as a CE based on the Checklist was neither arbitrary nor capricious.

## Section 4(f)

Plaintiffs allege that the FHWA violated Section 4(f) by approving the use of historic sites for the Project based on programmatic Section 4(f) evaluations, which Plaintiffs argue do not apply. Plaintiffs argue that the Historic Bridges Programmatic Section 4(f) Evaluation does not apply because the FHWA failed to consider Plaintiffs' Enhanced One-Lane Bridge Alternative.  Plaintiffs argue that the Enhanced One-Lane Bridge Alternative is a reasonable alternative to the widening of the Bridge and therefore an individual Section 4(f) evaluation is required to determine whether the Enhanced One-Lane Bridge Alternative is feasible and prudent.  23 C.F.R. §§ 774.3(a), (d).  The Enhanced One-Lane Bridge Alternative would include the following elements: (1) rehabilitation of the Bridge as a one-lane bridge in accordance with the U.S. Secretary of the Interior Standards; (2)

---

[15]In addition, Plaintiffs note that the Checklist initially incorrectly indicated that the Project would not require a permit from the U.S. Coast Guard.  Defendants concede that this determination was in error; they have since obtained a Coast Guard permit, in March 2009.

resurfacing and other measures to extend the useful life of the Bridge; (3) repair of guardrails and implementation of other measures such as appropriate signage and roadway markings to enhance the safety of the Bridge; and (4) only if demonstrably necessary, traffic control devices and/or illumination to reduce the chance of accidents on the Bridge. Plaintiffs' Memorandum in Support of Motion for Summary Judgment, pp. 18-19.

Defendants assert that the Enhanced One-Lane Bridge Alternative is no different from the one-lane rehabilitation option that Plaintiffs previously advocated and therefore offers nothing new. Defendants rejected the one-lane rehabilitation alternative during the Section 106 process because it would not improve safety. AR 170, Bates ## 2235, 2277-81. Defendants explain that, for example, any rehabilitation of the Bridge, whether one-lane or two, would necessarily include appropriate signage and roadway markings consistent with state and federal safety and design standards. *See* 23 C.F.R. § 650.405(b)(2).

Whether the Enhanced One-Lane Bridge Alternative is "new" or not, Plaintiffs argue that the FHWA's rejection of a one-lane alternative was arbitrary and capricious. Plaintiffs argue that the FHWA rejected their one-lane bridge alternative based solely on Defendants' unfounded assertion that one-lane bridges are inherently unsafe. Plaintiffs also argue that Defendants' own traffic accident information for the Bridge belies the contention that one-lane bridges are unsafe. In fact, Defendants' data shows that traffic accidents on the Bridge have not only been historically few and far between but minor, as well. AR 119, Bates # 1067. Plaintiffs argue that the data demonstrates that the traffic-calming effect of the one-lane Bridge is integral to safety. Plaintiffs further argue that Defendants' own consultant report supports the one-lane rehabilitation option. Defendants' One-Lane Bridge Safety Report states that "The use of standard traffic control devices

-15-

in a uniform manner, based on an analysis of the driver's task at the specific bridge location, is the proper means for restructuring driver expectancies and is the best solution short of reconstruction." AR 170, Bates # 2344-5.

One-lane bridges may not be inherently unsafe and traffic control devices may improve safety on them. However, the issue here is not, as Plaintiffs suggest, "whether an acceptable degree of public safety on a one-lane bridge can be achieved utilizing measures such as lane marking, signage, lighting and traffic control devices." Plaintiffs' Memorandum in Opposition and Reply to Defendants' Motion for Summary Judgment, p. 12. The only issue here is whether the FHWA abused its discretion by finding that a one-lane rehabilitation of the Harrods Creek Bridge was not a reasonable alternative to the Project. The court concludes that the FHWA did not abuse its discretion in so finding.

Defendants previously rejected the one-lane bridge alternative for the straightforward reason that it would not improve safety. Despite the summary appearance of various conclusions in the CE Checklist, there is ample evidence in the administrative record to support the FHWA's conclusion that the one-lane bridge alternative would not improve safety. It is evident that the FHWA relied on Defendants' traffic studies and reports. Most notably, the One-Lane Bridge Safety Report unambiguously concluded that while traffic control devices can improve safety on a narrow bridge, they are only the best solution in instances short of reconstruction. AR 170, Bates # 2344-5.

Plaintiffs focus on the finding that traffic control devices can improve safety on narrow bridges. However, the report states that this means of safety improvement is "the best solution short of (thus, meaning alternative to) reconstruction." AR 170, Bates # 2344-5 (parenthetical added). The FHWA determined that reconstruction to widen the bridge deck to two-lanes was the preferred

-16-

alternative for the Bridge because the current structure with two-lane approaches at both ends creates

a likelihood of collision, noting that:

> The western approach has a horizontal curve with insufficient sight distance which increase [sic] the likelihood of rear end collisions.  For the period April 2000 to March 2003 there were 7 rear end collisions.  In addition because the approach roadway is two-lanes there is the potential for head-on collision.  There was one documented head on collision on the bridge in August 2002.

AR 170, Bates # 2235.  The conclusion that the preferred alternative is reconstruction to widen the

deck is supported by the One-Lane Bridge Safety Report, which included data showing that "one-

lane bridges, where the bridge is more narrow than the approach roadway, create an unsafe condition

with potential hazardous consequences for motorists using River Road."  AR 170, Bates # 2336.

Therefore, no one-lane bridge alternative solves the safety concerns found by the FHWA.  The

preferred alternative of reconstruction is fully supported in the record.

Plaintiffs argue that the Minor Involvement with Historic Sites Programmatic Section 4(f)

Evaluation does not apply because the impact on the historic sites resulting from the Project will not

be minor.  The Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluation

provides, in pertinent part:

> 5. The impact on the Section 4(f) site resulting from the use of the land must be considered minor.  The word minor is narrowly defined as having either a "no effect" or "no adverse effect" (when applying the requirements of section 106 of the National Historic Preservation Act and 36 CFR Part 800) on the qualities which qualified the site for listing or eligibility on the National Register of Historic Places.  The ACHP must not object to the determination of "no adverse effect."

> 6. The SHPO must agree, in writing, with the assessment of the impacts of the proposed project on and the proposed mitigation for the historic sites.

Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluation at 31,118.  Plaintiffs

essentially argue that the MOA does not satisfy the terms of the Minor Involvement with Historic

Sites Programmatic Section 4(f) Evaluation and therefore an individual Section 4(f) Evaluation is required with respect to the properties touched by the Project.  Plaintiffs cite no authority for this proposition, however.  It appears that Defendants' compliance with Section 106 and Section 4(f) are inextricably intertwined in this instance.  Thus, for the reasons stated above regarding the FHWA's finding of no significant impact on historic sites with respect to compliance with NEPA, the court finds that the FHWA has complied with Section 4(f) in approving the use of the Minor Involvement with Historic Sites Programmatic Section 4(f) Evaluation.

The FHWA acted within the scope of its authority in executing the programmatic Section 4(f) approvals because there was no prudent and feasible alternative to the Project and the Project includes all possible planning to minimize harm to historic sites resulting from the Project.  The FHWA's decision was based on a consideration of the relevant factors and was neither arbitrary nor capricious.  The FHWA followed the necessary procedural requirements.  Accordingly, Plaintiffs have failed to show any valid reason why the Harrods Creek Bridge Project should not proceed.

CONCLUSION

Because the court finds upon review of the administrative record that Defendants are entitled to summary judgment as a matter of law, Defendants' motion for summary judgment will be granted. Plaintiffs' motion will be denied.  The injunction previously entered herein will be dissolved.

A separate order will be entered herein this date in accordance with this opinion.

July 23, 2009



**Charles R. Simpson III, Judge**
**United States District Court**